



### MEMORANDUM OPINION

No. 04-11-00363-CR

Winder Amedalio **MORALES**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 9, Bexar County, Texas
Trial Court No. 309557
Honorable Walden Shelton, Judge Presiding

Opinion by:    Phylis J. Speedlin, Justice

Sitting:    Karen Angelini, Justice
Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice

Delivered and Filed:  May 9, 2012

AFFIRMED

Winder Amedalio Morales appeals his misdemeanor conviction for driving while intoxicated.  We affirm the judgment of the trial court.

BACKGROUND

At 4:55 a.m. on November 20, 2009, off-duty San Antonio Police Department (SAPD) Officer Winder Morales was driving an unmarked police car on Highway 90.  It had just begun to rain when the car hit a guardrail and rolled over.  SAPD Officer John Sabo was driving home

after his shift and witnessed the accident; he saw the car fishtail and then strike the guardrail and flip over. Morales was able to crawl out of the car through a window. Sabo stopped to see if anyone was injured and to prevent further collisions. He testified that Morales was "coherent and cognizant," but that he noticed a moderate odor of alcohol on Morales's breath. On cross-examination, Sabo testified that he did not think Morales was intoxicated immediately after the accident occurred, and, in his opinion, Morales was not impaired at the time of driving.

SAPD Lieutenant Fortuna Cedillo was driving to work when he saw a wrecked car on the side of the road and stopped to render aid. Cedillo only spent a few minutes interacting with Morales but did not observe any signs of intoxication or smell any odor of intoxicants on Morales's breath.

SAPD Sergeant Ricky Meyer arrived to investigate the accident. Meyer testified that he observed Morales's bloodshot, glassy eyes. He also stated that Morales kept his head down during questioning and remained quiet and somber, shaking his head to answer some questions. Meyer was unable to smell alcohol, if any, on Morales's breath due to his allergies. Because of Morales's bloodshot eyes, his evasiveness, the empty Bud Light box[1] in his car, as well as the early morning hour and the seriousness of the accident, Meyer requested that an officer from the DWI unit make the scene to conduct a DWI investigation. On cross-examination, Meyer stated that he did not think Morales was intoxicated, and stated so in the accident report and in the internal affairs report that he authored after the accident.

SAPD Officer Santos Liendro and SAPD Sergeant Jason Engquist were dispatched to investigate an accident involving a city vehicle and a suspected intoxicated driver. Liendro testified that upon making contact with Morales he noticed a strong smell of intoxicants and also

---

[1] The Bud Light box was empty and there were no beer cans in the vehicle. Morales stated on the video that it was a prop for undercover purposes. Two officers confirmed that these boxes are used as props during undercover operations.

noticed that Morales had glassy, bloodshot eyes and was unsteady on his feet. Liendro testified that Morales initially denied drinking any alcohol, but then admitted to having a small amount to drink while working undercover earlier. Liendro asked Morales to perform the standardized field sobriety tests, but Morales declined. Liendro then placed Morales under arrest, and Morales refused to provide a sample of his blood or breath. After being presented with a warrant to have a sample of Morales's blood taken, Liendro drove Morales to the nurses' station to have his blood drawn. Liendro stated that he arrested Morales at about 5:45 a.m. on November 20, 2009, and that the blood sample was taken at 10:32 a.m., five hours and thirty-seven minutes after the accident occurred. The dashboard camera video from Liendro's patrol vehicle was admitted into evidence.

Sergeant Engquist observed Morales refuse to perform the field sobriety tests. Engquist asked Morales if he needed medical treatment, but he refused. Engquist smelled a strong odor of intoxicants on Morales's breath, and saw that he had bloodshot eyes. Engquist asked Morales if he was refusing to provide a breath specimen, and Morales answered yes. On cross-examination, Engquist admitted that the odor of alcohol and bloodshot eyes were not alone sufficient to develop probable cause that Morales was intoxicated.

SAPD Sergeant Wayne Shoquist testified that he and Morales conducted a warrant round-up on November 19, 2009 after a several months-long undercover narcotics investigation. Morales was working undercover that day. Shoquist testified that Morales visited Stacy's Sports Bar around 7 p.m. to locate a suspect on the warrant list. The operation ended at 8 p.m. Afterward, the officers celebrated at a police barbecue at Brackenridge Park. Shoquist stated that Morales did not appear intoxicated when he (Shoquist) left the barbecue at midnight.

SAPD Detective Richard Achilles was also part of the warrant round-up. He testified that he was at the police barbecue on November 19, 2009 and did not remember Morales drinking any beer, although he did see him holding a beer can and a soda can at various times; he also saw Morales eating food. He stated that Morales can be hard to understand at times because he speaks quickly and sometimes stutters. He last saw Morales at about 3:30 a.m. and stated that he did not appear to be intoxicated at that time.

SAPD Officer David Luther was at the magistrate's office when Officer Liendro brought Morales in for processing. Luther noticed that Morales had bloodshot eyes and a strong odor of intoxicants coming from him. Luther also noticed that Morales would not make eye contact with him, and Luther stated that it is very unusual for a police officer not to make eye contact. Luther noticed that Morales hung his head in "shame." Luther testified that he offered Morales the opportunity to submit a breath specimen, but he refused. Luther stated that he believed Morales was intoxicated that night.

Louis Ramirez, RN, testified that he drew Morales's blood at 10:32 a.m. on November 20, 2009 and placed two vials in the refrigerated lockbox in the magistrate's office. Veronica Hargrove, a toxicologist from the Bexar County Medical Examiner's Office, testified as to how the blood samples were tested. She stated that Morales's samples had to be tested in two runs, as the first time the blood sample was tested, the results of the two vials were too disparate to meet the lab's internal standard of plus or minus ten percent. At this time, Morales objected to the State's attempt to admit the blood test result, arguing that the result was unfairly prejudicial under Rule 403. After argument by counsel, the trial court overruled the objection by the defense, and admitted the computer printout showing Morales's blood alcohol content (BAC) to be 0.08%.

Michael Frontz, a quality assurance officer at the Bexar County Medical Examiner's Office, testified that the blood alcohol analysis performed on Morales's blood reflected a BAC of 0.08% at the time it was drawn at 10:32 a.m. on November 20, 2009. Frontz testified that there is a standard, linear elimination rate of alcohol in a human body, and that the standard rate in an average male is 0.015 grams per deciliter per hour. Frontz further stated that the average time it would take an individual to reach their peak BAC would be 30-90 minutes after last consuming alcohol, and that it would be "very unlikely" for it to take up to two hours to reach a post-absorptive state. Frontz was unable to definitively state whether Morales was in the absorptive or post-absorptive phase, or if Morales's BAC level was rising or falling at the time of the accident. Frontz testified that he did not know Morales's BAC at the time he was driving. On cross-examination, Frontz acknowledged that physical trauma could slow the rate of absorption and delay the peak BAC following the last drink.

On re-direct, Frontz explained that an estimate of BAC back in time could be achieved by applying an average elimination rate backwards in time over a set number of hours or minutes. He also testified that a BAC of 0.08% in a male of average weight typically indicates that 4-6 alcoholic drinks have been consumed.

The defense called SAPD Officer Jason Sanchez to testify. Sanchez responded to the accident on November 20, 2009. He did not observe anything that made him believe Morales was intoxicated. Morales told Sanchez that his back hurt after the accident.

Morales was charged with driving while intoxicated. The jury charge provided only an impairment theory of intoxication, asking the jury to find whether Morales was intoxicated by the loss of the normal use of his physical or mental faculties by reason of the introduction of alcohol into the body. The jury found Morales guilty of the misdemeanor offense of DWI, first

offense. The trial court sentenced Morales to 180 days in the Bexar County Jail, probated for a period of two years, plus three days in the Bexar County Jail as a condition of probation, and a $1,000 fine. Morales filed a motion for new trial, which was denied by the trial court. Morales timely appealed, and now argues the trial court erred in admitting the blood alcohol result over his Rule 403 objection and in allowing improper retrograde extrapolation testimony.

## STANDARD OF REVIEW

We review a trial court's evidentiary ruling on the admissibility of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *Mata v. State*, 46 S.W.3d 902, 908 (Tex. Crim. App. 2001) (en banc); *Miranda v. State*, 350 S.W.3d 141, 149 (Tex. App.—San Antonio 2011, no pet.). A trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736.

## DISCUSSION

### Applicable Law

Rule 403 of the Texas Rules of Evidence allows for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Threadgill v. State*, 146 S.W.3d 654, 671 (Tex. Crim. App. 2004). When undertaking a Rule 403 analysis, a trial court "must balance: (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation

of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted." *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). These factors may well blend together in practice. *Id*. at 642.

We must determine whether the trial court's ruling was reasonable in view of all the relevant facts. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006); *Miranda*, 350 S.W.3d at 149. It is only when there is a "clear disparity" between the degree of prejudice and the probative value of the evidence that exclusion is appropriate under Rule 403. *Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993) ("unfair prejudice" under Rule 403 refers to "an undue tendency to suggest decision on an improper basis").

Great deference is given to the trial court's decision to admit or exclude evidence under Rule 403. *See Winegarner v. State*, 235 S.W.3d 787, 791 (Tex. Crim. App. 2007) (stating that Rule 403 grants trial courts "considerable latitude" and "allows different trial judges to reach different conclusions in different trials on substantially similar facts without abuse of discretion"); *Montgomery v. State*, 810 S.W.2d 372, 378, 392 (Tex. Crim. App. 1990) (stating that appellate deference to Rule 403 determination "is a rule of judicial restraint, intended . . . to avoid the anomaly of having appellate courts usurp a function that the system assigns to the trial courts" and grants trial judges "considerable freedom in evaluating proffered evidence's probative value in relation to its prejudicial effect").

*Analysis — Rule 403 Balancing*

### A. Probative Value

Under the first factor, we examine "how compellingly the evidence serves to make a fact of consequence more or less probable." *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). Here, Morales's blood test result is evidence that he had consumed alcohol, and such

evidence tends to increase the probability that Morales was intoxicated at the time of driving. *See id.* (holding intoxilyzer results were probative of intoxication under both per se and impairment definitions of intoxication). Morales, however, contends that the 5½ hour delay in drawing his blood, coupled with the fact that the result was just at the proscribed legal limit, weighs in favor of excluding the evidence. *See State v. Franco*, 180 S.W.3d 219, 225 (Tex. App.—San Antonio 2005, pet. ref'd) (quoting *Mechler*, 153 S.W.3d at 449 (Cochran, J., concurring) ("the relative probative value of the [results] depends primarily upon . . . the degree to which the test result exceeds the legal limit . . . and . . . the amount of time elapsed between driving and the taking of the test"). Morales contends that the facts in his case are analogous to those in *Franco*, where this court held that the probative value of the blood test results were outweighed by their prejudicial value. *Franco*, 180 S.W.3d at 225. In *Franco*, the police were called to the scene of a deadly accident that occurred at 7:50 p.m. *Id*. at 220. The defendant admitted drinking one beer. *Id*. About an hour later, the defendant provided a breath sample which resulted in a BAC of 0.09%. *Id*. Thereafter, two blood samples were taken—one at 10:05 p.m., with a result of 0.07% BAC, and another at 11:55 p.m., with a result of 0.02% BAC. *Id*. The defendant filed a pretrial motion to suppress the blood test results and related expert testimony on retrograde extrapolation. *Id*. at 223. At the suppression hearing, the toxicologist testified, hypothetically, that the defendant's BAC was at least above 0.08 at the time of the accident, and probably over a 0.10 or possibly 0.15. *Id*. at 222. The trial court granted the motion to suppress, finding that the expert's retrograde extrapolation testimony was unreliable and that the probative value of the evidence was outweighed by its prejudicial effect. *Id*. This court affirmed, holding that the two- and four-hour delays in obtaining the two blood samples, as well as the fact that both results were *below* the legal limit, significantly diminished the probative

value of the blood test results. *Id*. at 225. "When a test is obtained long after the arrest and the result is at or below the legal limit, the logical inference that the person had a 0.08% BAC at the time of driving may be so tenuous that a trial judge appropriately exercises his discretion by excluding that specific test result under Rule 403 absent expert testimony that extrapolates the test result back to the time of driving." *Id*. (quoting *Mechler*, 153 S.W.3d at 449 (Cochran, J., concurring, joined by Meyers, Price, and Johnson, J.J.)).

In this case, however, Morales denied consuming anything more than a few sips of alcohol hours earlier while working the warrant round-up. Because the issue of consumption was contested, a blood test result indicating that Morales did in fact consume alcohol is probative of whether he was intoxicated at the time of driving. The trial court could have reasonably concluded that the result of the blood draw tended to make it more probable that Morales was intoxicated at the time of driving, especially since there was no evidence that Morales consumed alcohol after the accident. *See Mechler*, 153 S.W.3d at 440; *see also Stewart v. State*, 129 S.W.3d 93, 96 (Tex. Crim. App. 2004) (breath test results tended to make it more probable that defendant was intoxicated at time of driving because they provided evidence that she had consumed alcohol, and there was no evidence that she had consumed alcohol after driving). Thus, this factor weighs in favor of admissibility.

### B. Need for the Evidence

Under this factor, a proponent's need for a particular piece of evidence is reduced when the proponent "has other compelling or undisputed evidence to establish the proposition or fact." *Gigliobianco*, 210 S.W.3d at 641; *see also Mechler*, 153 S.W.3d at 441. In *Mechler*, the Court of Criminal Appeals held that this factor weighed in favor of excluding the testimony because the State had other evidence of Mechler's intoxication. *Mechler*, 153 S.W.3d at 441-42. The

arresting officer testified that Mechler rolled through a stop sign and was driving erratically; Mechler's breath smelled of alcohol when the officer approached his car; Mechler failed the field sobriety tests; and Mechler admitted to drinking "[a] little" alcohol. *Id*. at 441.

Here, in contrast, the evidence of intoxication consists of testimony that Morales: smelled of alcohol; had bloodshot, glassy eyes; was seen holding a beer can before 3:30 a.m.; admitted to consuming a few sips of alcohol to blend in undercover; was "unsteady on his feet"; refused to perform the standard field sobriety tests; and refused to provide breath and blood specimens. Absent results of the field sobriety tests, the State was left with subjective testimony of police officers to serve as evidence as to intoxication. *See Bagheri v. State*, 119 S.W.3d 755, 764 (Tex. Crim. App. 2003) (noting that testimony of arresting officers regarding their observations of intoxication was "somewhat subjective"). Because the evidence of intoxication was subjective, the State needed some objective evidence, i.e., the results of the blood draw, to support its other evidence as to consumption and impairment. Thus, the trial court could have reasonably concluded that the State's need for the evidence weighed in favor of admissibility.

### C. Potential to Impress the Jury on Improper Basis

The first counterfactor asks whether the evidence has the potential to impress the jury in an irrational way or suggest a decision on an improper basis. *Gigliobianco*, 210 S.W.3d at 641. "Rule 403 does not exclude all prejudicial evidence." *Mechler*, 153 S.W.3d at 440. Instead, the focus is on whether the evidence is "unfairly prejudicial"; that is, whether it has a "tendency to tempt the jury into finding guilt on grounds apart from proof of the offense charged." *Id*.; *Franco*, 180 S.W.3d at 225. The Court of Criminal Appeals has held that intoxilyzer results, and by extension, blood test results, are not normally unfairly prejudicial to a defendant because the results directly relate to the charged offense. *Mechler*, 153 S.W.3d at 440-41. Morales,

however, argues that the result of his blood draw, taken 5½ hours after the accident and just at the proscribed legal limit, could do nothing but force the jury to engage in a crude retrograde extrapolation in order to determine beyond a reasonable doubt if he had a BAC of 0.08% or more at the time of driving. The Texas Court of Criminal Appeals has rejected this argument. *See Stewart*, 129 S.W.3d at 97); *see also Subirias v. State*, 278 S.W.3d 406, 409 (Tex. App.—San Antonio 2008, pet. ref'd; *Franco*, 180 S.W.3d at 225. Although undoubtedly prejudicial to Morales, the blood test result showing Morales consumed alcohol is not unfairly prejudicial because it "relates directly to the charged offense." *Mechler*, 153 S.W.3d at 440-41. Because the evidence pertains to an allegation in the indictment, it does not have a great potential to impress the jury in an irrational way. *Id.* at 441. Thus, the trial court could have reasonably concluded that this counterfactor weighs in favor of admissibility.

### D. Confusion of the Issues and Undue Delay

The trial court must also consider whether the evidence has a tendency to confuse or distract the jury from the main issues in the case. *Gigliobianco*, 210 S.W.3d at 641. "Evidence that consumes an inordinate amount of time to present or answer, for example, might tend to confuse or distract the jury from the main issues." *Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007). "Undue delay" and "needless presentation of cumulative evidence" focus on the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted, and "concern[s] the efficiency of the trial proceeding rather than the threat of an inaccurate decision." *Id.*; *Gigliobianco*, 210 S.W.3d at 641.

Here, Morales was charged with driving while intoxicated. "Because the [blood draw] results relate directly to the charged offense, a jury could not be distracted away from the charged offense regardless of the required time to present the results." *Mechler*, 153 S.W.3d at

441. Therefore, the trial court could have reasonably concluded that the jury would not be confused by the admission of the blood test result. Additionally, the testimony related to the blood draw did not consume an inordinate amount of time—two witnesses were called to testify about the substance of the blood results which took up one day of the almost two-week trial. Thus, the trial court could have reasonably concluded that these counterfactors weighed in favor of admissibility. Morales also concedes that these counterfactors weigh in favor of admissibility.

### E. Misleading the Jury and Improper Retrograde Extrapolation

Finally, the trial court must consider whether the jury will be misled by the evidence when conducting a Rule 403 balancing test. "'Misleading the jury' refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds." *Gigliobianco*, 210 S.W.3d at 641. "For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Id.*

In this case, the trial court specifically prohibited the State from questioning its expert, Mr. Frontz, as to what Morales's BAC was at the time of driving based on the 0.08% BAC taken 5½ hours after the accident. This is because in *Mata v. State*, 46 S.W.3d 902, 916-17 (Tex. Crim. App. 2001), the Court of Criminal Appeals held that retrograde extrapolation is not reliable unless based on sufficient characteristics of the individual defendant on trial. Frontz admitted that he did not know certain characteristics pertaining to Morales—such as his height, weight, if and when he last ate, what he ate, and whether he was an alcoholic—to conduct a retrograde extrapolation and arrive at an estimated BAC at the time of driving. Thus, Frontz admitted he did not know Morales's BAC at the time of driving. On redirect, however, Frontz did testify that a standard elimination rate of 0.015 grams per deciliter per hour could be applied

to a blood test result to reach an estimated BAC at the time of driving. It is this testimony which Morales challenges as improper retrograde extrapolation.

Unlike other cases where retrograde extrapolation testimony has been held to be improper, the expert here did not provide the jury with a definitive BAC at the time of driving. *See, e.g., Douthitt v. State*, 127 S.W.3d 327, 334-35 (Tex. App.—Austin 2004, no pet.) (holding trial court erred in admitting expert testimony that defendant's BAC would have been "at least .13 or greater" at the time of driving); *Blumenstetter v. State*, 135 S.W.3d 234, 250 (Tex. App.—Texarkana 2004, no pet.) (holding trial counsel rendered ineffective assistance when he failed to object to expert's testimony that there was "no scenario" in which defendant's BAC would not have been "above .08 at the time of the accident"). Nonetheless, Morales argues that this case is similar to *Burns v. State*, 298 S.W.3d 697 (Tex. App.—San Antonio 2009, pet. ref'd), in which although the expert did not testify to a specific BAC, he provided the jury with the means to conclude that the defendant's BAC was within a specific range at the time of driving. *Id*. at 702. The expert told the jury that there was a "ten percent chance that he's rising at the time that he's tested, and there's a ninety percent chance that he's coming down." *Id*. We reasoned that this testimony told the jury two things:

> First, and requiring no mathematical calculations by the jury, there was a ninety percent chance Burns was in the elimination phase at the time of the test, making his alcohol level higher than .113 at the time of driving. Second, and requiring nothing more than the application of a simple mathematical calculation by the jury, even if Burns was in the absorption phase at the time of the breath test, given an absorption rate of .01 per hour, Burns's alcohol level would have been no lower than roughly .10 at the time of driving.

*Id*. Thus, we held that the testimony was improperly admitted because the expert knew none of the individual characteristics and facts necessary to express an opinion as to any range of alcohol concentration as required by *Mata*. *Id*.

Here, in contrast, Frontz did not express an opinion as to a range of alcohol concentration at the time of driving. In fact, he specifically told the jury that he could not determine Morales's BAC at the time of driving. Given the absence of an estimated BAC at the time of driving, the trial court could have reasonably concluded that the jury was equipped to evaluate the probative force of the blood test result. *See Gigliobianco*, 210 S.W.3d at 642. Further, the admission of the blood test result did not necessarily encourage the jury to engage in its own crude retrograde extrapolation because, under the impairment definition of intoxication submitted to them, the jury did not need to establish Morales's exact blood alcohol concentration at the time that he drove. *See Stewart*, 129 S.W.3d at 97. The jury only needed to believe beyond a reasonable doubt that Morales failed to have the normal use of his mental or physical faculties by reason of introduction of alcohol into his body at the time he drove. *Id.* The blood test results were capable of being properly considered with all of the other evidence to determine if Morales was impaired by alcohol at the time he drove. *Id.* ("The breath test results were pieces in the evidentiary puzzle for the jury to consider in determining whether Stewart was intoxicated at the time she drove."). Accordingly, the trial court could have reasonably determined that this counterfactor weighs in favor of admissibility.

### F. Conclusion

Considering all of the factors involved in the Rule 403 analysis, the trial court could have reasonably concluded that the probative value of the blood test result was not substantially outweighed by the danger of unfair prejudice. At worst, the trial court's decision was within the zone of reasonable disagreement. Given the deference and judicial restraint that must be applied when reviewing a Rule 403 determination, we conclude the trial court did not abuse its discretion in admitting the blood alcohol test result. *See Gigliobianco*, 210 S.W.3d at 642; *Mechler*, 153

S.W.3d at 442; *see also Powell v. State*, 189 S.W.3d 285, 288-89 (Tex. Crim. App. 2006) (emphasizing that trial judge, not appellate judge, is in best position to determine extent of prejudice caused a party by a piece of evidence).

## CONCLUSION

Based on the foregoing, we overrule Morales's sole issue on appeal, and affirm the judgment of the trial court.

Phylis J. Speedlin, Justice

Do not publish