**Craig Allen NEALE, Appellant**

**v.**

**The STATE of Texas, Appellee**

**NO. 14-15-00553-CR**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed June 1, 2017

---

Jonathan Landers, Neal Andrew Davis, Houston, TX, for Appellant.

Scott Ray Peal, Anahuac, TX, for Appellee.

Panel consists of Chief Justice Frost and Justices Brown and Jewell.

## OPINION

Kevin Jewell, Justice

A jury convicted appellant Craig Allen Neale of boating while intoxicated. In four issues, appellant asserts the trial court erred by: (1) denying his motion to suppress evidence based on an allegedly illegal stop; (2) admitting testimony concerning a horizontal gaze nystagmus test; (3) admitting retrograde extrapolation testimony; and (4) admitting appellant's blood test results. The State concedes error as to the third and fourth issues, and the parties have filed a joint motion to reverse and remand this case. However, our review of the record reveals no reversible error. Accordingly, we deny the parties' joint motion to reverse and remand, and we affirm appellant's conviction.

## Background

In the early morning hours of September 15, 2013, on the Trinity River near Anahuac, Texas, Parks & Wildlife Warden Patricia Vannoy saw a boat approaching her marked patrol vessel at a "fairly high rate of speed" as she conducted a water safety check on another boat. Concerned that the approaching boater had not seen her patrol vessel or the boat on which she was performing the safety check, Vannoy made a brief "sweeping motion" with her flashlight towards the other vessel. Vannoy's boat was a marked patrol vessel and was lit with navigation lights. Vannoy's boat also was equipped with flashing blue police lights, but they were not activated. After Vannoy shone her flashlight at the oncoming boat, she continued with her water safety inspection. Unbeknownst to Vannoy, appellant, who was operating the oncoming boat, decelerated and approached her patrol boat. Vannoy completed the safety inspection and noticed appellant's boat drifting nearby. She decided to perform a water safety inspection on appellant's boat and approached. She introduced herself to appellant as a game warden and performed a water safety inspection.

As Vannoy was performing her inspection, she detected a "strong smell of alcohol" emanating from appellant. She asked appellant if he had been drinking, and he responded that he consumed about five beers earlier in the evening. At that point, her focus shifted from water safety to a boating while intoxicated ("BWI") investigation.[1] She asked appellant to put on a life preserver and remove a pocketknife. As he attempted to comply, appellant stumbled over an anchor and tried to put on the life preserver inside-out. Vannoy

1. *See* Tex. Penal Code § 49.06(a) (providing that a person commits an offense if he is intoxicated while operating a watercraft).

instructed appellant to turn the life preserver around and fasten it correctly; then she asked him to step onto her vessel.

At Vannoy's request, appellant performed several "afloat" field sobriety tests; based on Vannoy's training and experience, appellant's performance indicated possible intoxication. Vannoy then conducted four standardized seated field sobriety tests, including the horizontal gaze nystagmus ("HGN") test, the finger-to-nose test, the palm pat test, and the hand coordination test. While performing these tests, appellant exhibited numerous signs of intoxication. Based on her investigation, Vannoy arrested appellant for BWI. She asked appellant to provide a breath or blood sample, and appellant agreed. After they returned to shore, Vannoy transported appellant to a nearby hospital where a medical technician took a sample of appellant's blood. Vannoy took the blood kit home with her and placed it in her refrigerator for safekeeping before mailing it to the Department of Public Safety ("DPS") crime lab for analysis.

At appellant's trial,[2] Vannoy testified regarding her interactions with appellant. Vannoy opined that, based on her training and experience, appellant was intoxicated. The State presented a videotape of Vannoy's BWI investigation. Hospital technician Lee Sampson described the blood draw procedures used to draw appellant's blood. DPS forensic scientist Brian Nacu, who analyzed appellant's blood, testified that appellant's blood alcohol concentration was 0.169 grams of alcohol per 100 milliliters of blood, which is above the legal limit of 0.08.[3] Nacu also testified regarding the

average elimination rate of alcohol and extrapolated that appellant's blood alcohol concentration at the time of appellant's arrest was likely "at least a .19."

After hearing the evidence, a jury found appellant guilty of Class B misdemeanor BWI. The trial court assessed punishment at 180 days' confinement, suspended imposition of the sentence, placed appellant on community supervision for 18 months, and assessed a $1,000 fine. This appeal timely followed.

## Analysis

### A. Motion to Suppress

In his first issue, appellant challenges the trial court's denial of his motion to suppress evidence. Specifically, he asserts that the trial court erred in denying his motion to suppress evidence of his intoxication because the game warden did not decide to perform a water safety check on appellant's boat until after she had seized the boat. According to appellant, a seizure unsupported by reasonable suspicion occurred at the moment Vannoy shone her flashlight in appellant's direction. Therefore, appellant contends, the stop was illegal and all intoxication evidence adduced after the inception of the seizure should have been excluded.

#### 1. *Standard of Review and Governing Law*

■■■ A defendant asserting a motion to suppress bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim.

---

**2.** Before the admission of most of the evidence in this case, the trial court held a lengthy "suppression" hearing outside the jury's presence. The hearing, which continued until the second day of trial, encompassed nearly 300 pages of the reporter's record and included the testimony of Vannoy, hospital

technician Lee Sampson, and forensic scientist Brian Nacu.

**3.** *See* Tex. Penal Code § 49.01 (defining "intoxicated" as, relevantly, having an alcohol concentration of 0.08 or more).

App. 2005) (citing *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986)). A defendant can satisfy this burden by establishing that a search or seizure occurred without a warrant. *See id.* (citing *Bishop v. State*, 85 S.W.3d 819, 822 (Tex. Crim. App. 2002)). The burden then shifts to the State to establish that the warrantless search or seizure was reasonable. *Id.*

■ We review the trial court's ruling on a motion to suppress under an abuse of discretion standard. *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005); *Thomas v. State*, 297 S.W.3d 458, 460 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd). We give almost total deference to the trial court's determination of historical facts but review de novo the trial court's application of the law to those facts. *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000); *Thomas*, 297 S.W.3d at 460. When the trial court does not make explicit findings of fact, we infer the necessary factual findings that support the trial court's ruling if the record evidence supports these implied fact findings. *State v. Garcia–Cantu*, 253 S.W.3d 236, 245 (Tex. Crim. App. 2008); *Ross*, 32 S.W.3d at 855. The party that prevailed in the trial court is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. *Garcia–Cantu*, 253 S.W.3d at 241.

■ There are three distinct categories of interactions between peace officers and citizens: (1) consensual encounters, (2) investigative detentions, and (3) arrests. *See Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). A consensual encounter does not constitute a seizure and does not implicate the Fourth Amendment. *Id.* A peace officer is always free to approach citizens and ask for information or their cooperation. *Garcia–Cantu*, 253 S.W.3d at 243. An investigative detention, however, triggers the Fourth Amendment's protec-

tions against unreasonable searches and seizures and therefore must be of limited scope and duration and supported by a reasonable suspicion of criminal activity. *See Johnson v. State*, 414 S.W.3d 184, 191-92 (Tex. Crim. App. 2013). An investigative detention occurs when a person surrenders to a police officer's show of authority, coupled with the person's reasonable belief that he is not free to leave. *Crain*, 315 S.W.3d at 49. Appellant's first issue turns on whether a given set of historical facts amounts to a consensual police-citizen encounter or a detention under the Fourth Amendment, which is a legal question we review de novo. *Garcia–Cantu*, 253 S.W.3d at 241. With this framework in mind, we turn to appellant's assertions.

### 2. *Application*

Appellant contends that Vannoy made a "show of authority"—by shining her flashlight at his boat—to which he "submitted," thus establishing that Vannoy's initial contact with appellant was a detention for Fourth Amendment purposes. We disagree for the following reasons.

■ Whether an interaction between a peace officer and a citizen amounts to a "detention" or "seizure" depends on specific facts as to the manner of the encounter, the degree of authority displayed, and all other circumstances surrounding the incident. *Cf. id.* at 244. Instances when a citizen's interaction with police amounts to a seizure, as opposed to a consensual encounter, include those attended by the threatening presence of several officers, the officer's display of a weapon, physical touching of the citizen by the officer, the officer's words or tone of voice indicating that compliance with the officer's request might be compelled, or the officer's use of flashing lights or blocking a suspect's vehicle. *Cf., e.g., United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64

L.Ed.2d 497 (1980); *Garcia–Cantu*, 253 S.W.3d at 243. Absent this type of evidence, otherwise inoffensive conduct between a citizen and a police officer cannot, as a matter of law, amount to a seizure of that person. *Mendenhall*, 446 U.S. at 555, 100 S.Ct. 1870.

In evaluating whether Vannoy's use of her flashlight on this occasion constituted a detention, we look first to precedent from the Texas Court of Criminal Appeals, which has examined whether officers' use of spotlights implicate the Fourth Amendment. In *Garcia–Cantu*, for example, the court distinguished the use of a patrol car spotlight from use of its flashing emergency lights. *Garcia–Cantu*, 253 S.W.3d at 245; *see also Crain*, 315 S.W.3d at 50. Considering numerous cases throughout the nation, the court noted that, while emergency lights are often involved in detention scenarios, spotlight use is often classified as necessary during police-citizen encounters; thus, its use will not necessarily convert a voluntary encounter into an investigative detention. *Garcia–Cantu*, 253 S.W.3d at 245; *see also Crain*, 315 S.W.3d at 50. Instead, courts must evaluate the specific facts of each situation, including the degree of authority displayed. *Garcia–Cantu*, 253 S.W.3d at 244. Intermediate appellate courts in this state similarly have rejected the mere use of overhead spotlights as triggering Fourth Amendment protections. *Franks v. State*, 241 S.W.3d 135, 142 (Tex. App.—Austin 2007, pet. ref'd) ("Use of the patrol car's overhead lights in an area that appeared dark and unoccupied except for a single car does not necessarily constitute a detention."); *Martin v. State*, 104 S.W.3d 298, 301 (Tex.

App.—El Paso 2003, no pet.) (concluding that officer's use of overhead lights did not necessarily cause encounter to become detention).

■ In the present case, it is undisputed that appellant was approximately one hundred yards from Vannoy's boat at the time she initially flashed her light in appellant's direction. Vannoy testified that, in shining her flashlight at appellant's boat, she simply was letting appellant know that she was on the river for safety's sake. The blue "takedown" lights on Vannoy's patrol boat were not activated, nor is there any indication that Vannoy directed her patrol boat's spotlights towards appellant's boat before appellant approached her. Vannoy did not attempt to call out verbally to appellant, nor did she terminate the water safety inspection she was performing to approach appellant's boat. Further, the record does not indicate that any additional officers were nearby when Vannoy first flashed her light in appellant's direction. The trial court, as the finder of fact, was free to believe Vannoy's testimony that her use of the flashlight on the night in question was not a show of authority and was instead an effort on Vannoy's part to warn appellant that he was approaching boats stopped on the river. *See Ross*, 32 S.W.3d at 855. And finally, during oral argument, appellant agreed that no provision of the Parks and Wildlife Code required him to stop upon seeing Vannoy point her flashlight in his direction.[4]

Viewing the evidence in the light most favorable to the trial court's ruling, and considering the totality of the circumstances, we conclude Vannoy did not effect

4. The Parks and Wildlife Code requires a boat operator to reduce speed and stop upon sighting activated flashing blue takedown lights on water safety vessels. *See* Tex. Parks & Wild. Code § 31.123 ("The operator of a vessel underway, on sighting *a rotating or flashing blue beacon of light,* shall reduce power immediately and bring the vessel to a no-wake speed and subsequent stop until the intention of the water safety vessel is understood." (emphasis added)).

a seizure when she pointed her flashlight at appellant's boat. Other than Vannoy's use of her flashlight, appellant points to no other evidence to support his argument that a Fourth Amendment seizure occurred at that moment. Contrary to appellant's position, authority from Texas and other jurisdictions holds that a Fourth Amendment seizure does not occur based on an officer's use of a spotlight alone.[5] Appellant directs us to no authority holding that an officer's use of a flashlight effects a detention under any circumstances. If, as courts have held, use of a spotlight alone is insufficient to effect a seizure, then Vannoy's momentary use of a flashlight is likewise insufficient. We thus conclude that Vannoy's use of her flashlight in a "sweeping motion" directed toward appellant's boat one hundred yards away was not a sufficient "show of authority" to establish a detention from the first moment appellant saw Vannoy's flashlight.

 Accordingly, an investigative detention did not incept until Vannoy

boarded appellant's boat to conduct a water safety inspection, which is authorized by statute.[6] All aspects of the interaction between Vannoy and appellant occurring before Vannoy began her safety inspection were consensual as a matter of law. Cf. Garcia–Cantu, 253 S.W.3d at 244; Franks, 241 S.W.3d at 142; Martin, 104 S.W.3d at 301. Once Vannoy noticed signs of appellant's intoxication while conducting the safety inspection,[7] she had reasonable suspicion to detain appellant to investigate whether he was boating while intoxicated. See Weeks v. State, 396 S.W.3d 737, 741-42 (Tex. App.—Beaumont 2013, pet. ref'd) ("But if reasonable suspicion develops during a safety and regulatory compliance inspection under Chapter 31, a warden may briefly detain the suspect further for investigative purposes."); cf. Hernandez v. State, 376 S.W.3d 863, 871 (Tex. App.—Fort Worth 2012, no pet.) (explaining that, once officer noticed signs of intoxication during what began as a consensual encounter, the officer had reasonable suspicion to

**5.** Cf. Garcia–Cantu, 253 S.W.3d at 244; Franks, 241 S.W.3d at 142; Martin, 104 S.W.3d at 301. Texas is not alone in this view. See State v. Baker, 141 Idaho 163, 107 P.3d 1214, 1218 (2004) ("This court joins the many other jurisdictions which have held that the use of a spotlight alone would not lead a reasonable person to believe that he was not free to leave, though it may be considered under the totality of the circumstances."); People v. Cascio, 932 P.2d 1381, 1388 (Colo. 1997) (officers' use of a spotlight and flashlights were "a matter of practical necessity as the encounter took place when it was getting dark, and we do not attribute any significance to their use"); State v. Clayton, 309 Mont. 215, 45 P.3d 30, 35 (2002) ("The police officers did not initiate the stop, but only pulled in behind [the defendant] and shined the spotlight to determine how many people were in the vehicle. The officers did not have their sirens or emergency lights on and the encounter took place on a public street."); State v. Calhoun, 101 Or.App. 622, 792 P.2d 1223, 1225 (1990) (noting that the "fact that the headlights and spotlight were on did not transform the en-

counter into a stop," where the officer did not park in such a way that prevented the defendant from driving away).

**6.** The Texas Parks and Wildlife Code permits a game warden to "stop and board any vessel subject to this chapter [to] determine compliance with applicable provisions." See Tex. Parks & Wild. Code § 31.124(a); see alsoSchenekl v. State, 30 S.W.3d 412, 416 (Tex. Crim. App. 2000) (determining that stops under section 31.124 do not violate the Fourth Amendment's prohibition on unreasonable searches and seizures). Thus, the Parks and Wildlife Code provides a valid and constitutional basis for Vannoy's detention of appellant to conduct a water safety inspection without a warrant or reasonable suspicion, which appellant does not dispute. See Tex. Parks & Wild. Code § 31.124(a); Schenekl, 30 S.W.3d at 416.

**7.** Appellant has not asserted that his conduct during the safety inspection did not give rise to reasonable suspicion that criminal activity had occurred or was occurring.

further detain the individual to investigate).

For the foregoing reasons, the trial court did not abuse its discretion in denying appellant's motion to suppress. *See Schenekl v. State*, 30 S.W.3d 412, 416 (Tex. Crim. App. 2000); *Weeks*, 396 S.W.3d at 741-42; *cf. Hernandez*, 376 S.W.3d at 871.

We overrule appellant's first issue.

## B. Evidentiary Issues

In his remaining three issues, appellant challenges the admission of various evidence.

### 1. *Standard of Review*

We review a trial court's admission of evidence for an abuse of discretion. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). We must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Id.* With this standard of review in mind, we turn to appellant's issues.

### 2. *HGN Test*

In his second issue, appellant asserts that the trial court erroneously admitted evidence of his HGN test results and performance. Specifically, he asserts that this evidence was inadmissible because Vannoy deviated from the proper HGN procedures in the following respects: (1) performing one pass of the test slightly quicker than the requisite two seconds; (2) failing to give explicit seating/positioning instructions; and (3) failing to screen appellant for various physical factors that could invalidate the test.

*Governing Law.* "Nystagmus is an involuntary rapid oscillation of the eyes in a horizontal, vertical, or rotary direction." *Plouff v. State*, 192 S.W.3d 213, 218 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (op. on reh'g). Horizontal gaze nystagmus refers to the inability of the eyes to follow smoothly an object moving horizontally across the field of vision, particularly when the object is held at a forty-five degree (or more) angle to the side. *Id.* Consumption of alcohol exaggerates nystagmus to the degree that it can be observed by the naked eye. *Emerson v. State*, 880 S.W.2d 759, 766 (Tex. Crim. App. 1994).

Testimony concerning an HGN test is scientific evidence subject to the requirements of *Kelly v. State*.[8] *Emerson*, 880 S.W.2d at 763. In *Emerson*, the Court of Criminal Appeals examined the underlying scientific theory of HGN testing and determined that the science is valid. *Id.* The *Emerson* court also determined that the HGN testing technique in the National Highway Traffic Safety Administration ("NHTSA") manual is valid. *Id.* at 768-69. The HGN technique is applied properly when an officer follows the standardized procedures outlined in the Driving While Intoxicated Detection Manual published by NHTSA. *Id.; see also Kelly*, 824 S.W.2d at 573 (explaining that the proponent must establish that the technique must have been properly applied on the occasion in question for the evidence to be admissible as scientific evidence). "Slight variations in the administration of the HGN test do not render the evidence inadmissible or unreliable, but may affect the weight to be given the testimony." *Plouff*, 192 S.W.3d at 219 (citing *Compton v. State*, 120 S.W.3d 375,

8. *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992). In *Kelly*, the Court of Criminal Appeals held that, for scientific evidence to be considered reliable and admissible, the proponent must establish that: (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question. *Id.* at 573.

378 (Tex. App.—Texarkana 2003, pet. ref'd)).

*Analysis.* Appellant contends that the State did not meet the third requirement of *Kelly* because it did not prove the test was administered properly on the occasion in question. *See Kelly*, 824 S.W.2d at 573. We disagree.

Regarding appellant's contention that Vannoy did not precisely follow the timing outlined in the NHTSA manual, such slight deviations in timing do not affect the validity of the test; instead, these differences go to the weight of the evidence, rather than its admissibility. *See id.*; *Compton*, 120 S.W.3d at 378; *see also Quinney v. State*, 99 S.W.3d 853, 857-58 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Appellant's other complaints similarly describe only slight deviations from protocol, which do not warrant exclusion of HGN test results.[9] *See Plouff*, 192 S.W.3d at 221 & n.7; *see also Webster v. State*, 26 S.W.3d 717, 721-22 (Tex. App.—Waco 2000, pet. ref'd) (determining that screening for potential causes of nystagmus, other than alcohol ingestion, can be performed while conducting the HGN test, consistent with the NHTSA manual); *see also Quinney v. State*, 99 S.W.3d 853, 858 (Tex. App.—Houston [14th Dist.] 2003, no pet.) ("The only pre-test screening required by the NHTSA Manual is for the officer to determine whether the suspect wears contact lenses or eyeglasses.").

Because appellant has not demonstrated that the trial court abused its discretion in admitting his HGN test results, appellant's second issue is overruled.[10]

3. *Retrograde Extrapolation*

In issue three, appellant urges that the trial court erred in admitting testimony from DPS forensic scientist Brian Nacu regarding his opinion of appellant's likely blood alcohol level at the time of appellant's arrest. In other words, appellant complains that Nacu improperly testified regarding retrograde extrapolation.

On appeal, the State concedes error on this issue. However, the State's concession does not necessarily resolve the issue in favor of appellant. "A confession of error by the prosecutor in a criminal case is important, but not conclusive, in deciding an appeal." *Saldano v. State*, 70 S.W.3d 873, 884 (Tex. Crim. App. 2002); *see also Estrada v. State*, 313 S.W.3d 274, 286-88 (Tex. Crim. App. 2010) (following *Saldano* and independently examining record to determine whether appellant's asserted issue had merit). Thus, despite the State's confession of error, we nonetheless independently examine the merits of appellant's claim. *See Saldano*, 70 S.W.3d at 891 (affirming trial court's judgment de-

9. Vannoy testified that when conducting an HGN test on a boat, the examiner should ensure that the suspect is sitting on the edge of his seat, arms by his side, and feet shoulder width apart, for stability. Additionally, the examiner should advise the suspect not to move his feet until the test is over and to hold his position during the test. Although Vannoy did not provide these detailed instructions to appellant, the record reflects that appellant was in a seated position, at the edge of his seat in a stable position with his arms by his sides, and with his feet approximately shoulder distance apart. Further, Vannoy-asked appellant if he felt stable, and appellant said that he did.

10. Further, in light of Vannoy's testimony that she noticed a strong smell of alcohol emanating from appellant, that appellant admitted to having consumed five beers, and that appellant's performance on two other standardized field sobriety tests indicated impairment, any error in admitting Vannoy's testimony concerning the HGN test likely did not substantially sway or influence the jury's verdict and, accordingly, was harmless. *See Plouff*, 192 S.W.3d at 222-23.

spite the State's confession of error); *see also Martin v. State*, 346 S.W.3d 229, 233 & n.1 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (affirming trial court's judgment even though State confessed error). And, as we explain next, we conclude that any error in admitting the retrograde extrapolation evidence, at most, had only a slight effect on the jury's verdict and must be disregarded.

██ A trial court's error in admitting retrograde extrapolation testimony does not rise to the level of constitutional error. *Bagheri v. State*, 119 S.W.3d 755, 762-63 (Tex. Crim. App. 2003); *see Owens v. State*, 135 S.W.3d 302, 310 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Thus, we must disregard the error if we have fair assurance that it did not influence the jury, or had but a slight effect. *Bagheri*, 119 S.W.3d at 762 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001), and citing Tex. R. App. P. 44.2(b)). We do not rely only on a determination that there is sufficient evidence to support the verdict. *See id.* Instead, we consider the entire record, "including testimony, physical evidence, jury instructions, the State's theories and any defensive theories, closing arguments, and voir dire if applicable." *Id.* (citing *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002)); *Veliz v. State*, 474 S.W.3d 354, 362 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

██ In cases involving intoxication offenses, the issue is "whether the erroneously admitted testimony might have prejudiced the jury's consideration of other evidence or substantially affected their [sic] deliberations." *Bagheri*, 119 S.W.3d at 763. "More specifically, the reviewing court should consider whether the State emphasized the error, whether the erroneously admitted evidence was cumulative, and whether it was elicited from an expert." *Id.*; *Burns v. State*, 298 S.W.3d 697, 703 (Tex. App.—San Antonio 2009, pet. ref'd); *Douthitt v. State*, 127 S.W.3d 327, 337 (Tex. App.—Austin 2004, no pet.)

In *Bagheri*, the State conceded that testimony regarding retrograde extrapolation should not have been placed before the jury. *Bagheri*, 119 S.W.3d at 760. The Court of Criminal Appeals concluded Bagheri was harmed and affirmed the court of appeals' reversal of the conviction. *Id.* at 762-64. In doing so, the high court reasoned that harm was evident in part because (1) the testimony was elicited from an expert; (2) throughout the trial, the State emphasized it would present scientific evidence from an expert demonstrating that Bagheri's blood alcohol content was over the legal limit at the time of driving; and (3) in closing argument, the State emphasized that the testifying expert "studied with the leading experts in the field" and his calculations were based on "scientifically reliable, valid evidence." *Id.* at 763. After examining the remaining evidence, the court concluded the retrograde extrapolation testimony was not cumulative and rejected the State's suggestion that there was overwhelming evidence of the defendant's guilt. *Id.* at 764. The court noted Bagheri presented an alternate explanation for his poor performance on the field sobriety tests. *Id.* The court also referred to the fact that during voir dire, several jurors expressed the opinion that a subject's blood alcohol content always would be higher at the time of driving; the court noted the jurors' statements were an indication of the "powerful persuasive effect that 'scientific' evidence has on the average juror." *Id.*

In *Owens*, this court followed *Bagheri* and concluded that Owens was harmed by the erroneous admission of retrograde extrapolation testimony. *Owens*, 135 S.W.3d at 312. However, in reaching this conclusion, we noted that the State emphasized

the expert's credentials and urged the jury to rely on the expert's opinion. *Id.* at 311. Further, the expert testified with certainty that Owens was "legally intoxicated" at a level of nearly twice the legal limit and, based on hypothetical questions, could not envision a scenario where Owens was not over the legal limit of 0.08. *Id.* The State also emphasized the expert's testimony during its closing argument. *Id.* And, Owens presented some evidence that he was not intoxicated at the time of the offense and, instead, began drinking after he was involved in an accident. *See id.*

Similarly, in *Veliz*, this court determined that Veliz was harmed by retrograde extrapolation testimony erroneously admitted by the trial court. *Veliz*, 474 S.W.3d at 367-68. We explained that the prosecution (1) relied on the expert's extrapolation testimony during closing arguments, (2) noted the "powerful persuasive effect" of such scientific testimony and the "subjective nature" of field sobriety testing, and (3) emphasized the testimony that undermined the non-extrapolation evidence of intoxication. *Id.* at 367. Additionally, we focused on a series of notes the jury sent to the trial judge during deliberations that indicated the jury "focused on the unreliable extrapolation testimony provided by the expert." *Id.* We emphasized that the jury notes, in particular, showed "that the erroneously admitted testimony either 'prejudiced the jury's consideration of other evidence' or at the very least 'substantially affected their deliberations.' " *Id.* at 367-68 (quoting *Bagheri*, 119 S.W.3d at 763).

In contrast, in *Douthitt*, the Austin Court of Appeals concluded that Douthitt was not harmed by the erroneous admission of retrograde extrapolation testimony. *Douthitt*, 127 S.W.3d at 338-39. The Austin court explained:

> [T]he retrograde extrapolation testimony in this cause was elicited from an

expert, but there is no indication that the jurors were predisposed to give such testimony greater weight than the other evidence before them. The retrograde extrapolation testimony was cumulative of other evidence of intoxication and was not given special emphasis by the State. Although the prosecutor did remind the jurors of Ortiz's testimony during his arguments, he did not claim special expertise for Ortiz or suggest that his testimony was alone sufficient to convict.

*Id.* at 339. The court determined that, given the strength of the State's case and the "relative weakness of appellant's defensive theories," it could "state with fair assurance that the erroneous admission of the retrograde extrapolation testimony had, at most, a slight effect on the jury." *Id.*

And, in *Burns*, the San Antonio Court of Appeals determined that the erroneous admission of retrograde extrapolation testimony did not harm Burns. *Burns*, 298 S.W.3d at 704-05. The San Antonio court distinguished *Bagheri* and *Owens*, explaining that the "common thread" in those cases was "the State's emphasis of the expert's credentials and the reliability of the retrograde extrapolation testimony." *Id.* at 704. The court noted that that emphasis was missing in *Burns*; the expert retrograde extrapolation testimony, when balanced with other persuasive evidence of intoxication, was harmless error. *Id.* at 705.

■ We conclude that the facts of this case are similar to those in *Douthitt* and *Burns* and are distinguishable from the facts in *Bagheri*, *Owens*, and *Veliz*. For example, the record does not reflect that the State told the jury it would present expert scientific evidence that appellant was over the legal blood alcohol content limit at the time he was operating his

boat.[11] During opening statements the State made no mention of retrograde extrapolation. And, as shown above, the retrograde extrapolation testimony was brief; the State did not emphasize the importance of this testimony. During closing argument, the State made only brief references to the retrograde extrapolation testimony. Nor does the record indicate jury notes, questions, or other evidence showing that the retrograde extrapolation evidence substantially swayed the jury's deliberations. Thus, this case stands in contrast to *Bagheri*, *Veliz*, and *Owens*, where the State emphasized the importance of retrograde extrapolation and the credentials of the expert who testified regarding the extrapolation. *Bagheri*, 119 S.W.3d at 763; *Veliz*, 474 S.W.3d at 367-68; *Owens*, 135 S.W.3d at 311. Further, other compelling evidence of intoxication exists in this case, such as: (1) the field sobriety testing results; (2) the blood test results from a sample taken relatively soon after the arrest; (3) Vannoy's observations that appellant exuded a strong odor of alcohol, stumbled over the anchor on his boat, and placed his life jacket on inside-out; and (4) Vannoy's testimony that, based on her observations, appellant was intoxicated. *Cf. Burns*, 298 S.W.3d at 705. Finally, we note that appellant did not present any defense witnesses who undermined the strength of the State's evidence. *Cf. Bagheri*, 119 S.W.3d at 764 ("There was some testimony indicating that [appellant's] erratic driving and poor performance on the sobriety tests were caused by fatigue."); *Owens*, 135 S.W.3d

at 311-12 ("[T]he defense offered a reasonable explanation for appellant's alleged intoxication when the officers arrived.").

Based on our review of the record in light of the factors enunciated in *Bagheri*, we are fairly assured that Nacu's extrapolation testimony, at most, had only a slight effect on the jury. *See Burns*, 298 S.W.3d at 705; *Douthitt*, 127 S.W.3d at 339. Thus, we must disregard this error.

For the foregoing reasons, appellant's third issue is overruled.

### 4. *Admission of Blood Test Results*

■ In his fourth issue, appellant asserts that the trial court abused its discretion in admitting his blood test results because the State failed to prove that Nacu used properly compounded chemicals or that Nacu understood the scientific theory behind the machinery he used to test appellant's blood. As it did regarding issue three, the State concedes error on appellant's fourth issue. Yet, the State's confession of error will not warrant a remand if our examination of the record shows that appellant failed to preserve error. *See Saldano*, 70 S.W.3d at 891 (affirming trial court's judgment despite the State's confession of error based on independent determination that appellant failed to preserve complained-of error). We examine the record to determine whether appellant preserved this complaint at trial.

Appellant contends he preserved error, citing several pages of the reporter's record. But the record reflects that the only

---

11. We do not have a record from the voir dire proceedings in this case. Under *Rowell v. State*, 66 S.W.3d 279, 282 (Tex. Crim. App. 2001), the appealing party is required to present a record "so complete as to enable the appellate court to decide the point of error." *Accord, e.g., Guajardo v. State*, 109 S.W.3d 456, 462 n.17 (Tex. Crim. App. 2003) ("It is, however, the appealing party's burden to en-

sure that the record on appeal is sufficient to resolve the issue he presents."); *Ortiz v. State*, 144 S.W.3d 225, 229 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) (explaining that appellant has burden to present a record to show error requiring reversal insofar as he is required to develop record to show nature and source of error).

objections to the admission of the blood test results were that (1) the blood kit used to collect appellant's blood had expired, (2) the draw was invalid because appellant's arrest was invalid, and (3) the blood draw itself was not properly performed by the medical technician.

In short, appellant's trial objections do not comport with his argument on appeal; thus, this issue was not preserved for our review. *See Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) ("Whether a party's particular complaint is preserved depends on whether the complaint on appeal comports with the complaint made at trial."). Although the State concedes error on this point, appellant has not shown that he raised in the trial court his appellate complaints concerning Nacu's knowledge of the proper compounding chemicals or Nacu's understanding of the scientific theory behind gas chromatography. *See id.*; *see also Saldano*, 70 S.W.3d at 891.

■ Under these circumstances, despite the State's confession of error, we conclude that this issue is not presented for our review because appellant failed to object at trial on the grounds presented on appeal. *See Pena*, 285 S.W.3d at 464; *Saldano*, 70 S.W.3d at 891.

We overrule appellant's fourth and final issue.

### Conclusion

Having overruled appellant's issues, we affirm the trial court's judgment.