**Affirmed and Memorandum Opinion filed March 30, 2023.**



In The

# Fourteenth Court of Appeals

## NO. 14-22-00252-CR

**JOHN EARL MCKISSACK, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 21st District Court**
**Washington County, Texas**
**Trial Court Cause No. 19295**

## MEMORANDUM OPINION

A jury found Appellant John Earl McKissack guilty of aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(b). On appeal, Appellant challenges the trial court's exclusion of certain evidence showing that the Complainant previously had been convicted of theft. For the reasons below, we affirm.

### BACKGROUND

Before the underlying events occurred, Appellant and Complainant were roommates and friends. But on January 17, 2021, Appellant shot Complainant in the hip with a handgun. Appellant was arrested and charged with aggravated

assault with a deadly weapon.

Appellant proceeded to a jury trial in March 2022. By this time, Complainant had died in an unrelated incident.

The jury heard testimony from ten witnesses, eight of whom testified for the State and two testifying for Appellant. We summarize relevant portions of their testimony below.

### Appellant's Girlfriend

Appellant's girlfriend ("Girlfriend") was at the house when the shooting occurred. Describing the events leading up to the incident, Girlfriend said she arrived at the home the day before the shooting and spent the day with Appellant and Complainant. Girlfriend said "[e]verything was fine when I got there. Every — I mean, there was no arguing, there was no fussing, there was no fighting. [Appellant and Complainant] were getting along." Girlfriend acknowledged that "[t]here was some drinking going on."

As the night went on, Girlfriend said the three of them "[l]isten[ed] to music" and continued drinking; Girlfriend described everything as "normal." Girlfriend said she and Appellant were not drunk when they went to bed later that night. Girlfriend recalled that Complainant stayed up for a while longer listening to music.

Girlfriend said she and Appellant woke up the next morning at approximately 7:30 a.m. Girlfriend said Appellant went outside to work on the house's hot water heater while she stayed inside to sort laundry. According to Girlfriend, neither she nor Appellant drank any alcohol that morning.

Girlfriend said she was walking out of the master bedroom when she saw Complainant in the kitchen taking "a double shot of vodka." Girlfriend recalled

2

that Complainant began "taunting" Appellant and going "in and out" of the house — "coming in to take shots out of his bottle and then back outside to taunt [Appellant]." Girlfriend said Complainant was being "obnoxious" and seemed "tipsy." According to Girlfriend, Complainant "knew what buttons to push" when it came to Appellant.

Girlfriend said Appellant eventually became "aggravated" with Complainant. Girlfriend recalled that both men returned inside the house where they "continued this agitation" in the living room. Girlfriend said she was sorting laundry in the same room while Appellant and Complainant continued arguing, with her back turned to the men. Girlfriend said she would periodically "turn and look" at the men and, at one point, saw that Appellant had a gun in his hand. According to Girlfriend, Appellant was "waving" the gun and gesturing at Complainant to "leave."

Girlfriend said her back was turned when she heard the gun go off. When Girlfriend turned around, Appellant was standing in the room with the gun in his hand and Complainant was bleeding on the ground. According to Girlfriend, Appellant wiped the blood off Complainant's phone and handed it to Complainant, while telling him to "[t]ell them Lampey did it."

Girlfriend said Appellant then walked outside the home. Girlfriend corralled her dogs, picked up her purse, and also left the house. Girlfriend said she and Appellant got in her car; Girlfriend recalled Appellant saying, "I can't believe that I just did that." Girlfriend did not remember Appellant saying that the shooting had been accidental.

According to Girlfriend, she and Appellant spent the night at her relatives' home. The next day, Girlfriend dropped Appellant off at a park in Rosenberg. Girlfriend said she was contacted by Detective Whiddon two days later and

3

questioned about the shooting. Girlfriend said she then talked to Appellant and reported Appellant's location to Detective Whiddon.

Reviewing the course of events, Girlfriend recalled thinking that the men were just having "another one of their crazy arguments that they always had." Girlfriend said this argument was similar to ones she had previously seen the men engage in; describing other arguments, Girlfriend said the men typically "were friends again" by "the next morning." When asked if Appellant could have been acting in self-defense by shooting Complainant, Girlfriend said it was "possible." She also acknowledged that Complainant was younger and more able-bodied than Appellant and that Appellant walked with a limp. Girlfriend said she never saw Complainant touch or hit Appellant while they were arguing.

### Officer Duke

Officer Duke was the first law enforcement officer to respond to Complainant's 911 call reporting the shooting. According to Officer Duke, he walked in the house and saw Complainant in "a pool of blood on the ground." Officer Duke said Complainant was coherent and conscious. Officer Duke did not remember smelling any alcohol in the home.

Officer Duke recalled Complainant telling him that "his roommate had shot him and that — when I asked him how — like, if they were fighting or anything like that, he said no, they were — that his roommate was just being funny."

### Sergeant Janes-Busse

Sergeant Janes-Busse arrived at the house shortly after Complainant's 911 call. Sergeant Janes-Busse said Complainant was sitting in a recliner when she walked in the house and recalled seeing a blood stain on the floor. When asked what Complainant told her about the shooting, Sergeant Janes-Busse said Complainant told her "the alleged suspect, his roommate, [Appellant], was mad

4

and he was trying — drunk and trying to show off in front of his girlfriend."

### Paramedic Tanner Jacob

Paramedic Jacob also responded to the home following Complainant's 911 call. Jacob said he saw Complainant in the living room and recalled that Complainant was "shot through the hip." According to Jacob, Complainant was alert and coherent and said that "his roommate shot him." Jacob said he noted in his report that "there was a smell of alcohol and potentially marijuana" in the home. Jacob said Complainant was transported to the local hospital.

### Investigator McAnally

Investigator McAnally interviewed Complainant at the hospital the day of the shooting. McAnally said that Complainant was "coherent" and answered questions "appropriately." McAnally also said Complainant appeared "intoxicated" and had "slurred" speech.

McAnally recalled that Complainant's account "changed" with respect to how many times he was shot at — McAnally said Complainant referenced "three, four, up to six or seven" shots. McAnally said Complainant's recollection regarding where he was standing in the living room when he was shot also changed. Despite these variations, McAnally said he found Complainant "credible."

### Lieutenant Blakey

Lieutenant Blakey also interviewed Complainant at the hospital. Lieutenant Blakey recalled smelling alcohol on Complainant's breath but said Complainant answered the questions coherently and appropriately. Lieutenant Blakey recounted the following conversation with Complainant:

Q.      What did [Complainant] tell you?

A.      Do you want his exact words or —

Q.      If you recall, please.

A.      He said that he had been in fights before with [Appellant].

Q.      And had he caused any injuries to [Appellant]?

A.      He said — I asked him, I said, so did you whip [Appellant's] ass before?

Q.      And he answered?

A.      "Yes."

                    *                    *                    *

Q.      Did [Complainant] tell you maybe [Appellant] shot him because [Appellant] knew he couldn't beat [Complainant] with his hands?

A.      Yes, he did say that, yes.

### Nurse Morton

Nurse Morton treated Complainant at the hospital. According to Morton, Complainant told her he was shot by Appellant, whom he described as "his roommate and friend."

### Relevant Evidentiary Ruling and the Jury's Verdict

During the witnesses' testimony, Appellant offered into evidence a certified felony conviction from 2016, showing that Complainant previously had been convicted of "theft of property, $2,500, [with] two or more previous convictions." The State objected to the evidence and the trial court sustained the State's objection.

After the close of evidence, the jury deliberated and found Appellant guilty

of aggravated assault with a deadly weapon.  *See* Tex. Penal Code Ann. § 22.02(b).  The jury assessed punishment at life imprisonment.  Appellant timely appealed.

**ANALYSIS**

Appellant raises three issues on appeal:

1. the appeal should be abated to permit the filing of a supplemental record containing the exhibit showing Complainant's felony conviction;

2. the trial court violated Appellant's constitutional rights by excluding evidence of Complainant's felony conviction; and

3. the trial court abused its discretion by excluding evidence of Complainant's theft conviction.

We address these issues individually below.

## I. Abatement

In his first issue, Appellant asks that we abate the appeal and order the filing of a supplemental record containing the excluded exhibit showing Complainant's felony conviction.  This is in substance a motion to supplement the reporter's record with an exhibit, the 2016 felony conviction, not an issue directed at error in the trial court's judgment, and we treat it as a motion.

To preserve error regarding a trial court's decision to exclude evidence, the complaining party must comply with Texas Rule of Evidence 103 by making an "offer of proof," which sets forth the substance of the proffered evidence.  *See* Tex. R. Evid. 103; *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009).  The offer of proof may consist of a concise statement by counsel that "include[s] a reasonably specific summary of the evidence offered and [] state[s] the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible."  *Mays*, 285 S.W.3d at 889-90 (internal quotation omitted).  "The primary purpose of an offer of proof is to

7

enable an appellate court to determine whether the exclusion was erroneous and harmful." *Id*. at 890 (internal quotation omitted).

Here, although the exhibit showing Complainant's felony conviction is not contained in the reporter's record, counsel's description of its contents is sufficient to permit the court to determine whether the trial court erred in excluding the evidence. *See, e.g.*, *Williams v. State*, 964 S.W.2d 747, 753 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (any error stemming from the exclusion of certain witness testimony from the record was harmless when it was clear from the record "exactly what [the defendant] wanted to preserve for appeal"); *see also Smith v. State*, No. 01-13-00438-CR, 2014 WL 4219556, at *3 (Tex. App.—Houston [1st Dist.] Aug. 26, 2014, pet. ref'd) (mem. op., not designated for publication) (any error from the exclusion of certain evidence "was harmless because it is apparent from the record what appellant was attempting to establish"). Therefore, it is not necessary to abate this appeal to permit the filing of a supplemental reporter's record.

We overrule Appellant's motion to supplement the reporter's record.

## II. Exclusion of the Exhibit Showing Complainant's Felony Conviction

Appellant asserts that the exclusion of the exhibit showing Complainant's felony conviction violated his constitutional rights as well as the Texas Rules of Evidence.

### A. Constitutional Rights

In his second issue, Appellant contends that "[t]he trial court's exclusion of [Complainant's] prior theft conviction violated his constitutional right to present a complete defense." In response, the State asserts that Appellant's argument was not raised in the trial court and therefore is not preserved for appeal.

We presume without deciding that Appellant's issue premised on the right to present a complete defense was properly preserved. We proceed to analyze the merits of Appellant's argument.

The United States Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *Kelly v. State*, 321 S.W.3d 583, 592 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). A trial court's exclusion of evidence may violate this right if the ruling excludes otherwise relevant, reliable evidence which forms such a vital portion of the case that exclusion effectively prevents the defendant from presenting a defense. *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002); *Young v. State*, 358 S.W.3d 790, 804 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

However, "[e]rroneous evidentiary rulings rarely rise to the level of denying the fundamental constitutional rights to present a meaningful defense." *Potier v. State*, 68 S.W.3d 657, 663 (Tex. Crim. App. 2002). The fact that a defendant was unable to present his case to the extent and in the form he desired does not rise to constitutional error if he was not prevented from presenting the substance of his defense to the jury. *Id.* at 666; *see also Harris v. State*, 152 S.W.3d 786, 794 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) ("A defendant's right to present relevant evidence is not unlimited, but rather subject to reasonable restrictions." (internal quotation omitted)). In this context, we review a trial court's decision to exclude evidence for an abuse of discretion. *See, e.g.*, *Young*, 358 S.W.3d at 803.

Here, Appellant has not shown that the exclusion of evidence regarding Complainant's theft conviction effectively prevented him from presenting a defense in the underlying proceeding. *See Wiley*, 74 S.W.3d at 405; *Kelly*, 321 S.W.3d at 592. Although this evidence was relevant with respect to Complainant's

9

credibility, Complainant's credibility was not a central issue. As the witnesses' testimony showed, Complainant's statements about the shooting painted a multifaceted picture of what occurred — a picture that was not definitive as to Appellant's culpability or motive. For example, Officer Duke recounted that Complainant said Appellant "was just being funny" when he shot him and denied that they had been fighting. According to Lieutenant Blakey, Complainant acknowledged that he previously had "whip[ped] [Appellant's] ass" and said Appellant shot him because he knew he "couldn't beat [Complainant] with his hands." Finally, Nurse Morton testified that Complainant told her he was shot by Appellant, whom he described as "his roommate and friend." Against this backdrop, Complainant's credibility was not central to resolving the issues of fact presented to the jury. Accordingly, evidence pertaining to Complainant's credibility did not form a vital portion of Appellant's case. *See Wiley*, 74 S.W.3d at 405; *Young*, 358 S.W.3d at 804. The trial court did not abuse its discretion in excluding this evidence. *See Young*, 358 S.W.3d at 803.

We overrule Appellant's second issue.[1]

### B.    Texas Rules of Evidence

In his third issue, Appellant contends that evidence of Complainant's felony conviction was admissible under Texas Rule of Evidence 609, which permits impeachment with evidence showing commission of a felony or a crime involving moral turpitude. *See* Tex. R. Evid. 609. The State asserts that Appellant waived this argument by failing to specifically reference Rule 609 in the trial court.

To preserve error, a party must present "the grounds for the ruling . . . with sufficient specificity to make the trial court aware of the complaint, unless the

---

[1] Justice Spain would overrule the second issue for lack of preservation of an appellate complaint and not reach the merits. *See* Tex. R. App. P. 33.1(a).

specific grounds were apparent from the context." Tex. R. App. P. 33.1. This requires that the complaining party inform the trial court what he wants, why he thinks he is entitled to it, and to do so clearly enough for the trial court to understand him when it is in the proper position to do something about it. *Pena v. State*, 285 S.W.3d 459, 463-64 (Tex. Crim. App. 2009). "Error preservation does not involve a hyper-technical or formalistic use of words or phrases; rather, straightforward communication in plain English is sufficient." *Leal v. State*, 469 S.W.3d 647, 649 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

The admissibility of prior convictions to attack a witness's character for truthfulness is governed by Texas Rule of Evidence 609. *See* Tex. R. Evid. 609. A crime of moral turpitude is one of the types of convictions that may be used for impeachment purposes. *See id*. By asserting that evidence of Complainant's conviction was admissible as "a conviction for a crime of moral turpitude which goes directly to credibility," Appellant's objection was sufficiently specific to apprise the trial court of the basis for Appellant's argument, *i.e.*, Rule 609. *See id*.; *Pena*, 285 S.W.3d at 463-64. Therefore, this argument is properly preserved for appeal. *See* Tex. R. App. P. 33.1.

We review a trial court's evidentiary ruling for an abuse of discretion. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018). Under this standard, we must uphold the trial court's ruling if the record reasonably supports it and it is correct under any applicable legal theory. *Neale v. State*, 525 S.W.3d 800, 809 (Tex. App.—Houston [14th Dist.] 2017, no pet.). A trial court does not abuse its discretion when its ruling falls within the zone of reasonable disagreement. *Gonzalez*, 544 S.W.3d at 370.

Under Rule 609, evidence of a criminal conviction "must" be admitted if the following three requirements are met:

11

1. the crime was a felony or involved moral turpitude, regardless of punishment;

2. the probative value of the evidence outweighs its prejudicial effect to a party; and

3. it is elicited from the witness or established by public record.

Tex. R. Evid. 609(a). This impeachment tool is not limited to witnesses; it also may be employed to attack the credibility of a declarant whose hearsay statements have been admitted into evidence. *See* Tex. R. Evid. 809 ("When a hearsay statement . . . has been admitted in evidence, the declarant's credibility may be attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness."). Here, several witnesses testified as to Complainant's hearsay statements regarding the shooting. Accordingly, Rule 609 provided a potential route for Appellant to attack Complainant's credibility. *See* Tex. R. Evid. 609, 806; *see, e.g.*, *Morris v. State*, 214 S.W.3d 159, 187 (Tex. App.—Beaumont 2007), *aff'd*, 301 S.W.3d 281 (Tex. Crim. App. 2009).

Specifically, Appellant sought to introduce evidence showing Complainant had been convicted of theft in 2016. "Theft is a crime of moral turpitude involving elements of deception." *Huerta v. State*, 359 S.W.3d 887, 892 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Thus, Rule 609's first requirement was satisfied. *See* Tex. R. Evid. 609(a).

Turning to Rule 609's second requirement, the burden was on Appellant to demonstrate that the probative value of Complainant's conviction substantially outweighed its prejudicial effect. *See* Tex. R. Evid. 609(a); *Blacklock v. State*, 611 S.W.3d 162, 170 (Tex. App.—Houston [14th Dist.] 2020, pet. ref'd). In applying the Rule 609 balancing test when the witness is not the defendant, courts generally consider the following nonexclusive factors: (1) the impeachment value of the

12

prior crime; (2) the temporal proximity of the conviction to the date the witness testifies and the witness's subsequent criminal history; (3) the similarity of the past crime to any conduct at issue in the present trial; (4) the importance of the witness's testimony; and (5) the importance of the credibility issue. *Blacklock*, 611 S.W.3d at 170.

Application of these factors shows that the trial court's decision to exclude evidence of Complainant's prior conviction was not outside the zone of reasonable disagreement.

First, although a theft conviction carries a higher impeachment value because it is a crime of deception, it is outweighed by the remaining factors as outlined below. *Id.* at 171.

Second, some years had elapsed between Complainant's theft conviction and his statements describing the shooting. Complainant was convicted in 2016; he was shot (and made the statements describing the shooting) in January 2021, approximately five years later.

Third, there is little similarity between Complainant's theft conviction and any conduct at issue at Appellant's trial.

Fourth, Complainant's hearsay statements were not critical to the underlying proceeding. The charge asked the jury to determine whether Appellant committed aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(b). Setting aside Complainant's hearsay statements, the jury heard a significant amount of evidence describing the shooting. Girlfriend's testimony, in particular, provided a thorough recounting of events both before and after the shooting. The jury did not hear any evidence suggesting that the shooting had been committed by someone other than Appellant. At most, evidence of Complainant's prior conviction was relevant only to attack Complainant's general credibility.

13

Finally, and most importantly (as discussed above), Complainant's credibility was not a central issue in the underlying proceeding. Several witnesses testified that Complainant told them he was shot by Appellant; this assertion was corroborated by all the evidence in the case. Complainant's statements about the shooting were not necessary to resolve the issues presented nor were they definitive as to Appellant's intent or motive.

Therefore, we conclude that the trial court did not abuse its discretion in excluding evidence of Complainant's conviction. We overrule Appellant's third issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/      Meagan Hassan
Justice


Panel consists of Justices Zimmerer, Spain, and Hassan.
Do Not Publish – Tex. R. App. P. 47.2(b)

14